IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| **CSX Transportation, Inc.,** | ) | Civil Action No. 3:14-cv-03821-MBS |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **PLAINTIFF'S** |
| | ) | **SUPPLEMENTAL MEMORANDUM** |
| | ) | **OF LAW** |
| | ) | |
| | ) | |
| **South Carolina Department of Revenue and** | ) | |
| **Rick Reames III, Agency Director of the** | ) | |
| **South Carolina Department of Revenue,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Pursuant to the Court's Text Order of May 9, 2017, plaintiff CSX Transportation, Inc. ("CSXT") hereby submits a supplemental brief to address the issues on remand from the United States Court of Appeals for the Fourth Circuit

## I. INTRODUCTION

This Court's previous Findings of Fact, Conclusions of Law, and Order entered on June 7, 2016 (Doc. 86) stated the nature of the claim brought by CSXT and the history of the case.[1] The Court conducted a bench trial on November 3, 2015, where both parties had the opportunity to submit all evidence supporting the plaintiff's claims and the defendants' defenses. The Court also received pretrial briefs and post-trial proposed findings of fact, conclusions of law, and proposed orders from both parties.

---

[1] CSXT takes no issue with the Court's 13 enumerated Findings of Fact, except for Finding of Fact No. 11, which discusses the equalization factor. CSXT's position with respect to that finding is discussed herein.

The Fourth Circuit has now set the proper legal framework for the resolution of this case. *See* CSX Transportation, Inc. v. South Carolina Dept. of Revenue, 2017 WL1040461 (4th Cir. 2017)(hereinafter, "USCA op."). It has resolved against the defendants their two major defenses. First, the Fourth Circuit has ruled that the plaintiff's claim squarely falls under Section 306(1)(d) of the 4-R Act, 49 U.S.C. § 11501(b)(4)[2] because CSXT alleges that the denial of the benefits of the limitation on increases in valuation provided by the South Carolina Real Property Valuation Reform Act ("the Cap") constitutes "another tax that discriminates" against railroads. Second, the Fourth Circuit has affirmed CSXT's and this Court's view that the increase in valuation limitation is not an "exemption" immune from attack under Section 11501(b)(4), thereby rejecting the defendants' reliance on the United States Supreme Court's decision in Department of Revenue v. ACF Industries, 510 U.S. 332 (1994). So, as stated by the Fourth Circuit in its remand to this Court, "the application of (b)(4) in this case will be fairly straight-forward." *See* USCA op. at *9.

The Fourth Circuit observed that this Court's previous judgment reached neither the substantive question whether the challenged tax was discriminatory under Section 306(1)(d), nor the defendants' alleged "justifications" for the discriminatory tax. Although both of these issues were previously addressed in CSXT's Pretrial Brief (Doc. 72) and Post-Trial Proposed Findings of Fact and Conclusions of Law (submitted to chambers on January 11, 2016), this Memorandum will summarize CSXT's arguments that the record already taken by the Court confirms that the denial of the benefits of the Cap results in the imposition of a tax that discriminates against railroads, and that the defendants have raised no legally or factually sufficient "justifications" for

---

[2] This brief will refer to Section 306(1)(d) and its codification, 49 U.S.C. § 11501(b)(4), interchangeably.

this discrimination.  In other words, the record substantiates unlawful Section 306(1)(d) discrimination against CSXT.

## II.  THE *PRIMA FACIE* CASE

Although the existence of the facial discrimination presented by this case has never been seriously contested, the Fourth Circuit noted that the question whether CSXT has presented evidence sufficient to establish a *prima facie* case of a Section (b)(4) violation is best first addressed by the district court on remand.  *See* USCA op. at *7, n. 12.  This Memorandum recaps that what is not seriously contested – namely, denying a significant property tax benefit to railroads that is provided to other commercial and industrial taxpayers, creates a *prima facie* case of discrimination.

First, the proper comparison class has never been disputed.  The Verified Complaint in this case identifies other commercial and industrial real property in South Carolina as the proper comparison class.  *See* Doc. 1, ¶ 23. As the Supreme Court held in Alabama Dept. of Revenue v. CSX Transportation, Inc. 135 S.Ct. 1136 (2015)("CSXT II"), Section 11501(b)(4) affords the plaintiff the opportunity to identify a proper comparison class of "similarly situated" taxpayers. *See* 135 S.Ct. at 1141-42.  There is no question that, in the context of property taxes presented here, other commercial and industrial real property comprise the appropriate comparison class. The general class of commercial and industrial real property owners and railroads are "similarly situated" because they both own real property that is subject to tax in South Carolina, used for commercial pursuits, and subject to the same property tax rates in each of South Carolina's taxing jurisdictions.  And because the Cap applies to commercial and industrial real property but excludes the property of railroads and a few other disadvantaged taxpayers, the general class of commercial and industrial real property owners must be the appropriate comparison class.  The case precedent from other circuits cited favorably by the Fourth Circuit (as well as common sense) make it

3

abundantly clear that the proper comparison class in this case is other commercial and industrial taxpayers. *See, e.g.* Burlington Northern RR Co. v. Huddleston, 94 F.3d 1413 (10th Cir. 1996); Burlington Northern RR Co. v. Bair, 766 F.2d 1222 (8th Cir. 1985); Ogilvie v. State Bd. of Equalization, 657 F.2d 204 (8th Cir.), *cert. denied*, 454 U.S. 1086 (1981).

But the defendants seem to assert— notwithstanding ample legal precedent to the contrary— that the assessment of railroad property and other commercial and industrial property is very different because railroads are assessed on a unit value basis, while other non-utility commercial and industrial property is assessed "piecemeal" by parcel using a "summation" approach. Congress, however, was aware that railroads were valued under the unit rule while locally assessed property was valued using summation approaches, and nonetheless concluded that they were similarly situated.[3] Courts readily corroborated this proposition in all the legal precedents cited above where plainly the railroads were valued on a unit basis and yet compared with commercial and industrial businesses. The simple fact is that no matter which valuation method is used, the goal of all property assessments in South Carolina is market value. It is uncontested that the most efficient method to determine fair market value of a railroad – as recognized by the South Carolina legislature – is unit valuation. (Tr. at pp. 142-143, testimony of Taylor Ingram). Thus, the different methodologies applied by assessing authorities in South Carolina to derive market value do not render railroad property "dissimilarly situated" from other commercial and industrial property.

Having properly identified the comparison class, the analysis turns to whether the denial of the Cap to railroads presents a case of facial discrimination. It cannot be seriously argued that

---

[3] Senate Report No. 91-630, 91st Cong., 1st Session, Appendix A (copy attached hereto as Exhibit A).

the denial of the Cap to railroads is anything other than facial discrimination. The strongest proof of discrimination is the undisputed fact that, over a period of time when the property tax valuation of real property of other commercial and industrial property could not increase more than 15%, the tax valuation of CSXT's real property increased by approximately 51%. (Pl. Exh. 33)(Tr. at pp. 22-24). It is hard to imagine a clearer *prima facie* case of discrimination. In fact, the Fourth Circuit has endorsed CSXT's view that South Carolina has "singled out" railroads (and a handful of other disfavored taxpayers) for discriminatory treatment. *See* USCA op. at *7. The Fourth Circuit's ruling eliminates any plausible argument that CSXT has failed to make at least a "*prima facie*" case.

### III.  BURDEN OF PROOF

Under the analytical framework as set forth by the Supreme Court in <u>CSX Transportation, Inc. v. Alabama Dept. of Revenue</u>, 562 U.S. 277 (2011) ("<u>CSXT I</u>"), the establishment of a *prima facie* case shifts the burden of proof to the defendants. That burden is to prove legal or factual "justifications" for the discrimination. *See* <u>CSXT I</u>, 562 U.S. at 288, n. 8) In recognition of this shifting of the burden of proof, the majority of the proof submitted to the Court at trial (other than the defendants' rejected efforts to invoke <u>ACF</u>) focused on defendants' attempts to present "justifications" for the discrimination, and CSXT's rebuttal of those alleged justifications.

The Supreme has a long and rich history of determining whether there is "sufficient justification' for imposing a facially discriminatory tax under its Dormant Commerce Clause cases. *See, e.g*. <u>Oregon Waste Sys. v. Dep't Envtl. Quality</u>, 511 U.S. 93 (1994) and the cases cited therein. In order for a facially discriminatory tax to be valid the State must "sho[w] that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." <u>Oregon Waste</u>, 511 U.S. at 100-102; citing, <u>New Energy Co. of Ind. v, Limbach</u>, 486 U.S. 268, 278 (1988). None of the purported "justifications" urged by the Commissioner come

5

close to meeting this standard. Nevertheless this Memorandum will turn to the alleged justifications advanced by the defendants, as best CSXT can determine from the nature of the proof and the defendants' briefing and proposed order submitted to the Court post-trial to show why they do not "sufficiently justify" this facially discriminatory tax.

### IV. THE DOR'S JUSTIFICATIONS

In order to aid the Court in its disposition of the case, this Memorandum incorporates and recites certain of its proposed Findings of Fact and Conclusions of Law submitted by CSXT to the Court in chambers on January 11, 2016.

#### A.     "Practical Problems"

Notwithstanding the clear-cut and easily applied method to calculate the Cap relief for railroads as demonstrated by Mr. Carnahan (*see infra*, Section V), the defendants are expected to argue that it is problematic and imprecise to apply the Cap to railroad property. Besides being factually incorrect, the defendants cannot escape the teachings of the Fourth Circuit in Clinchfield Railroad Co. v. Lynch, 700 F.2d 126 (4th Cir. 1983). North Carolina attempted to bar relief for obvious discrimination because of perceived problems of proof in plaintiff's case. The Fourth Circuit, on the other hand, ruled that once the plaintiff makes a strong showing of discrimination, the state may not merely continue to apply its obviously flawed statute. In words equally applicable here, the Fourth Circuit observed:

> Bearing in mind the remedial purposes of the Railroad Revitalization and Regulatory Reform Act of 1976, it is sensible that the burden of proof has been allocated to the state. It is also sensible that the state's legislators be afforded an incentive to effect revisions necessary to eradicate the inherently discriminatory practices evidently imbedded in the present version of their state's law.

*See* 700 F.2d at 134 (footnote omitted).

CSXT offered the following proposed findings rebutting the alleged justification by the defendants that affording the Cap to railroad real property poses insurmountable practical problem:

> 43. Because South Carolina treats real property and personal property differently as a result of the Cap (which applies only to real property), it is necessary in order to afford relief to the railroad to "breakout" the real property portion of the South Carolina allocated value. There is an accepted and widely used convention for separating real and personal property from a unit value which is used in states where real and personal property are taxed differently, as is now true in South Carolina. (Tr. at pp. 30-32) Mr. Carnahan demonstrated that calculation in Plaintiff's Exhibit 13. The percentage of the South Carolina value which is attributable to real property is derived by using gross book value numbers from CSXT's balance sheet. CSXT's financial information separately identifies real property assets (which are in "road" accounts), and personal property assets (which are "rolling stock accounts"). (Tr. at pp. 29-30)(Tr. at pp. 39-40) This allows for the determination of the South Carolina valuation which can be attributable to real property. According to Plaintiff's Exhibit 13, approximately 75% of CSXT's value is attributable to real property. (Tr. at p. 30).

\*\*\*

> 55. Mr. Ingram [Taylor Ingram, the DOR's Utility Assessment Coordinator] testified to perceived practical problems in applying the Cap to railroad real property. For example, he testified that the unit value includes both real and personal property together, and that calculating a "breakout" would not necessarily reflect the "value" of CSXT's real property. (Tr. at pp. 147-150)

> 56. But the Court finds that the "breakout" described by Mr. Carnahan [Kerry Carnahan, CSXT's Director-Property Taxes] is an acceptable procedure to use when state law treats personal property and real property differently. The Court notes that, even using Mr. Ingram's procedures, the unit value is necessarily allocated in order to determine the South Carolina value, and further, the values are assigned to the cities and counties. (Tr. at pp. 154-155) And he admitted under cross-examination that these allocations do not necessarily represent value, but he must use them anyway. (Tr. at pp. 164-168) Therefore, the real property breakout is not a violation of the unit valuation process. It is widely accepted and reliable.

> 57. Mr. Houck [Sanford Houck, Special Projects Coordinator for the DOR] testified that the "breakout" methodology used by Mr. Carnahan is "certainly not a novel concept," and that it is discussed at seminars of tax administrators and professionals that he has attended. (Tr. at pp. 83-84)

> 58. Mr. Ingram also suggested that some of the book accounts used by Mr. Carnahan as "real property" might include some personal property. (Tr. at pp. 150-151) But Mr. Ingram offered no quantitative analysis of this perceived problem. In fact, the DOR offered no alternative method to identify CSXT's real

7

property, nor did it offer any alternative calculation for a breakout.  Mr. Ingram testified only that he "cannot feel comfortable" with a breakout (Tr. at p. 170), but such a breakout is necessary where a state treats personal property and real property differently.

The "breakout" utilized by Mr. Carnahan has received judicial approval.  *See* Burlington Northern Railroad Co. v. Bair, 584 F. Supp. 1229, 1234-36 (S.D. Iowa 1984), *aff'd* in relevant part, 766 F.2d 1222 (8th Cir. 1985).

### B.    The Equalization Factor

The defendants apparently will argue that the "equalization factor" required by South Carolina statute, and enacted more than 15 years before the valuation Cap, somehow "justifies" the denial of the Cap to railroads.  This Court's Finding of Fact No. 11 does not completely describe the components of the equalization factor.  Although the 20% factor is partially designed to account for "disparities between the fair market valuation of railroads and other properties," the factor is also designed to account for the fact that a substantial amount of commercial real property is assessed at 6% of value, while railroad real property is assessed at 9.5% of value, a difference of approximately 37%. CSXT recites the following proposed findings of fact concerning the "equalization factor":

> 25.    The next step [in the assessment of railroads] is the application of the "equalization factor."  The testimony of Mr. Carnahan reveals that the "equalization factor" is statutory. S.C. Code Ann. § 12-43-220(g).  The relevant statute became effective in 1991 to correct some of the inequities that resulted to railroads under South Carolina law, and to bring South Carolina tax practices in accord with Section 306.  The equalization factor is 20% which means that railroads pay tax on 80% of their assessment as determined under the previous steps.  One of the inequities that the factor rectifies is the different statutory levels of assessment for other commercial and industrial properties.  As an example, commercial real property is assessed at only 6% of its market value, whereas railroads are assessed at 9.5%.  So the 20% equalization factor in part corrects for that inequity.  (Tr. at p. 21)(Tr. at p. 46)
>
> 26.    Another inequity that the 20% equalization factor was designed to correct was the fact that railroad property was valued for property taxes at 100% of

fair market value, while other commercial and industrial property was being valued at less than 100% of fair market value. (Tr. at p. 21)(Tr. at p. 47)

27. Mr. Sanford Houck, who has been with the DOR for 45 years, confirmed Mr. Carnahan's testimony concerning the purpose of the equalization factor (Tr. at pp. 80-81), as did Charles Brewer, a field operations manager for the DOR. (Tr. at pp. 118-19)

28. The 20% equalization factor was designed to bring South Carolina law in compliance with federal law, at least as of 1991. (Tr. at pp. 21-22).

59. Mr. Ingram testified that the practical effect of the 20% equalization factor was to "remove or exempt" 20% of CSXT's assessment. (Tr. at pp. 153-154) But neither Mr. Ingram, nor any other witness for the DOR, testified that this 20% equalization factor, established in 1991, remedied the denial of the Cap to railroad real property.

60. Mr. Houck confirmed Mr. Carnahan's testimony that the equalization factor was developed around 1991 to account for *de jure* discrimination arising from the statutory assessment ratios, and for *de facto* discrimination arising from the fact that CSXT's property was appraised at 100% of market value, while non-utility property was not appraised at 100% of value. (Tr. at pp. 80-82)

61. There was no proof in this record that the 20% equalization factor developed in 1991 has any connection to the Cap legislation enacted in 2006. And, notwithstanding the 2006 Cap legislation, the proof in this record concerning the assessment of commercial and industrial property in South Carolina establishes that the *de jure* and *de facto* discrimination addressed in 1991 still exist and require an equalization factor of at least 20%.

**C.     Different Assessment Cycles**

Another alleged "justification" for denying the Cap to real property is the differing reassessment cycles among South Carolina's 39 counties. The following was the proof concerning this alleged problem, as cited in CSXT's Proposed Findings:

62. Mr. Ingram testified that application of the Cap to CSXT's real property would be problematic because CSXT has property in 39 counties, and those counties have different reassessment cycles. (Tr. at pp. 155-158, Defendant's Exhibit 3). But the Court finds that this is no excuse for denying the benefits of the Cap to CSXT's real property. The Act established a "base year" of 2007, and in 2007, CSXT was appraised at its full market value. Placing CSXT on 5-year cycles beginning in 2007 does not create favored treatment for CSXT, notwithstanding different reappraisal cycles in the various counties. To the

9

contrary, it merely puts CSXT on an equal footing with other commercial and industrial taxpayers.

>       63.     Mr. Brewer admitted that CSXT – without the benefit of the Cap – would be treated differently than other commercial and industrial taxpayers, who are appraised only every five years.  Therefore, every year, in many counties – perhaps most of them – only property valued on the unit basis (such as CSXT's) would be reappraised at market value. (Tr. at pp. 121-22)  The Court has reviewed Defendants' Exhibit 3, which shows the implementation schedule for the 5-year reassessment cycles from 2006 thru 2014.  It shows that, at most, only 16 counties are reappraised in a year, and sometimes the total is as low as two counties.  This confirms Mr. Brewer's testimony that, in most counties, CSXT is being appraised at full value when other commercial and industrial taxpayers are not.  This clearly results in discrimination against railroads.

### D.     Assessable Transfers of Interest

Under the Cap legislation, a property which undergoes an "assessable transfer of interest" [for example, a sale] can be put on the tax roll at full value.  This was the testimony concerning assessable transfers of interest as cited in CSXT's Proposed Findings:

>       64.     Mr. Houck testified on behalf of the DOR and suggested the denial of the Cap to railroads is justified because railroads do not have "assessable transfers of interest," whereas other commercial and industrial real property sells, resulting in re-assessments not limited by the Cap.  Mr. Hock testified that "without a sale [of railroad property], there would be no way to get back to a fair market value." (Tr. at p. 69)  But the facts and law do not support this attempted excuse to deny the Cap to railroads.  First, it is pure speculation that CSXT will not ever undergo an assessable transfer of interest.  Railroad property can and does sell.  Furthermore, Mr. Houck overlooks the fact that assessors currently do not "get back to fair market value" for all assessable transfers of interest.  As a result of a 2011 amendment to the Act, an assessable transfer of interest of commercial real property is only assessed at 75% of value, and not "fair market value." S.C. Code Ann. § 12-37-3135(B). (Tr. at pp. 66-67)  Therefore, Mr. Houck's concern is illusory, and there was no proof that this purported justification played any role in the Act's exclusion of railroad real property from the Cap.

### E.     Other Taxes

Over the plaintiff's relevance objections, the DOR presented the testimony of John McCormick to testify about sales and use tax.  This testimony was apparently submitted in order to show that certain provisions of the South Carolina <u>sales</u> tax somehow "justify" denying the

<u>property</u> tax Cap to railroads. No legal precedent of the Supreme Court or any other court allows this type of alleged justification, and in fact substantial precedent prohibits an examination of the overall tax structure of the State in order to "justify" a facially discriminatory tax. CSXT incorporates the following from its Proposed Conclusions of Law concerning this issue.

> 23.     The DOR's reliance on <u>CSXT II</u> [to rely on South Carolina sales tax] is misplaced. <u>CSXT II</u> was a sales tax case, and not a property tax case. The issue raised in <u>CSXT II</u> involved a fact scenario where railroads were forced to pay a sales tax on their purchase of diesel fuel, but motor carriers and water carriers – the railroads' principal competitors – were exempt from the tax. In that very limited context, the Supreme Court left the door open for the state to prove that a motor fuel tax paid by interstate motor carriers was "roughly equivalent" to the sales tax paid by railroads on diesel fuel, thus constituting a "sufficient justification" for discrimination. The Supreme Court also left open for the state an avenue of attempting to "justify" why the diesel fuel of water carriers was not taxed at all.
>
> 24.     <u>CSXT II</u> is inapplicable here. To look beyond the contours of the South Carolina Real Property Valuation Reform Act would be inappropriate in this case. As this Court has already observed, this is a case where railroads have been "singled out" as part of an isolated and targeted group for discriminatory treatment, in the words of the Supreme Court in ACF. Nothing in <u>CSXT II</u> limits the applicability of ACF's recognition of the prohibition of targeting railroads, along with other disfavored taxpayers. This case is no more complicated than the recognition that all taxable commercial and industrial real property receives an assessment limitation that is denied to the railroad.
>
> 25.     Plaintiff's counsel lodged a standing objection to all of the "justification" testimony submitted by the DOR. Although the Court overruled that objection at trial, the Court now concludes that the "justification" evidence submitted by the DOR is irrelevant under Rule 401 of the Federal Rules of Evidence. The recent announcement by the United States Supreme Court in regard to the "justification" of discrimination does not render the DOR's proffer of "justification" relevant or admissible. The case before this Court is a property tax case, and not a sales tax case. The case before this Court does not involve the alleged "rough equivalencies" of different taxes. In fact, the DOR's proof made no effort to establish any "rough equivalencies." What the DOR attempts to do here is exactly what was prohibited by the Fifth Circuit in <u>Kansas City Southern Railway Co. v. McNamara</u>, *supra*, [817 F.2d 368, 377 (5th Cir. 1987)]. In defense of the imposition of the gross receipts tax that was applied only to railroads and other public utilities, Louisiana tried to rely on its sales and use tax statutes. Louisiana further asked the Fifth Circuit to compare the "overall tax burden" of railroads and other commercial and industrial taxpayers. The Fifth Circuit rejected that invitation, as this Court does now.

26. In <u>Arizona Public Service Co. v. Snead</u>, 441 U.S. 141 (1979), a state tried to defend its discriminatory tax against electricity producers by asking the court to examine the state's total tax structure to determine whether the tax was discriminatory. The Supreme Court rejected the notion that a court should look at an entire tax structure in order to decide whether a specific tax is discriminatory. *See* 441 U.S. at 149-50.

27. <u>CSXT II</u> does not change the judicial disapproval of considering "overall tax burdens" as a justification for discrimination under Section 306.

28. Even if this court would conclude that the justification evidence was relevant under Rule 401, it should be excluded under Rule 403, which excludes relevant evidence if its probative value is substantially outweighed by confusion of the issues or the waste of time. For the reasons cited by the Supreme Court in <u>Snead</u> and by the Fifth Circuit in <u>McNamara</u>, the suggestion that a court examine the tax structure of a state is time consuming, and is an endeavor for which the courts are not well equipped.

29. And even if this Court were to consider the "justification" evidence, the evidence is woefully lacking that the exclusion of the railroads from the Cap legislation is somehow "justified." The DOR apparently argues that the South Carolina sales tax exemption for railroad diesel fuel, and the sales tax exemption for rolling stock and repairs to rolling stock, somehow "justify" denying the property tax limitation to railroad real property. But the facts show that most states exempt locomotive diesel fuel, and 19 of the 23 states in which CSXT operates exempt locomotive diesel fuel from the sales tax. And the proof further showed that it is likewise common for states to provide a sales tax exemption for rolling stock and rolling stock repairs. Again, the proof showed that of the 23 states in which CSXT operates, 18 of those states exempt rolling stock and rolling stock repair parts. In fact, the proof showed that CSXT pays substantial sales taxes in South Carolina, mostly on the cost of repair and maintenance of its track and signal materials. Therefore, the DOR's "justification" evidence provides no justification at all for the discriminatory treatment of CSXT's real property.

In any event, these "justifications" are also factually deficient. The following are excerpts from CSXT's proposed findings on the proof offered by the defendants:

65. Over the Plaintiff's relevance objection, the DOR presented the testimony of John McCormack to testify about sales and use taxes. He testified that the sales tax is imposed on the retail sale of personal property, and on certain services. (Tr. at pp. 125-126) Mr. McCormick cited two sales tax exemptions that allegedly "benefit railroads." South Carolina exempts fuel used by railroads, as well as railroad rolling stock and parts. (Tr. at p. 128). But Mr. McCormick declined to testify that these allegedly beneficial sales tax exemptions justify a discriminatory property tax, and he made no attempt to determine whether these exemptions compensate CSXT for the property tax discrimination. (Tr. at p. 131).

12

66. Vickie Friedman, CSXT's Director of Sales and Use Taxes, testified that CSXT operates in 23 states and two Canadian provinces. (Tr. at p. 188) She testified that most states exempt locomotive fuel. Only 4 of the 23 states in which CSXT operates tax CSXT's locomotive fuel. (Tr. at p. 190).

67. Likewise, Ms. Friedman testified that it is common for states to exempt rolling stock and repair parts. Only five of CSXT's states tax those items (*Id.*)

68. CSXT is a substantial taxpayer in South Carolina. Ms. Friedman testified that CSXT pays appropriately $2.3 million a year in South Carolina sales taxes on non-exempt items and services, mainly repair and maintenance of track and signal material. (Tr. at p. 190) On non-exempt items, CSXT pays the same sales tax as everybody else in South Carolina. (Tr. at p. 191).

69. Testifying from Plaintiff's Exhibit 3, which is a list of South Carolina Sales and Use Tax Exemptions, Mr. McCormick identified a number of substantial sales tax exemptions benefitting non-railroad commercial and industrial taxpayers – taxpayers who receive the benefit of the Cap. For example, all fuel used by manufacturers is exempt, as well as fuel and supplies used by water carriers. Machinery used by manufacturers is exempt, as well as electricity used by manufacturers in the manufacturing process. (Tr. at pp. 132-36).

70. And while railroads do not pay a motor fuel tax on their non-highway use of locomotive fuel, CSXT does pay the motor fuel tax for its on-highway use of motor vehicles, as does every other user of the highways in South Carolina. (Tr. at p. 137)(Tr. at p. 192).

## V. **PROPER RELIEF**

Mr. Carnahan introduced Plaintiff's Exhibit 1 in order to show CSXT's 2014 tax assessment should be if the Cap were applied to real property, as is done with other commercial and industrial real property. *See* Tr. at pp. 25-28. While denying that CSXT is entitled to the benefits of the Cap, the defendants introduced Defendants' Exhibit 6, which purportedly shows an alternative calculation for applying the Cap to CSXT for the 2014 tax year. (Tr. at p. 159). Mr. Taylor, however, disavowed this alternative calculation (Tr. at pp. 159-160, 172-175). Therefore, there is no dispute concerning the maximum assessed value for CSXT for tax year 2014 which is compliant with Section 306. CSXT recites the following from its proposed Findings of Fact:

13

47.     The Court finds that the alternative suggestion presented in Defendants' Exhibit 6 would not afford CSXT the full benefit of the Cap. As explained by Mr. Carnahan and shown on Defendants' Exhibit 6, the value of CSXT's real property would increase in 2010 by 15% over 2007, approximately two years short of the five-year reassessment cycles that apply to other commercial and industrial taxpayers. Other taxpayers who were appraised at full value in 2007 – as was CSXT – would not have any increases in their value in tax year 2010. They would not see an increase until 2012. (Tr. at pp. 197-198)

48.     Furthermore, under the alternative calculation set forth in Defendant's Exhibit 6, CSXT's real property value would increase by another 15% over the 2010 value in tax year 2013. As Mr. Carnahan pointed out, the defendant's calculation would impose two 15% increases on CSXT's property within a four-year period. No other commercial and industrial taxpayer would see an effective 30% increase within a four-year period from 2009 to 2013. (Tr. at p. 198).

49.     In contrast, Mr. Carnahan's calculation contained in Plaintiff's Exhibit 1 demonstrates a treatment for CSXT consistent with how other commercial and industrial taxpayers are treated; that is, to have a five-year period before the Cap is applied, and then have another five-year period before there would be another increase. (Tr. at p. 198).

50.     Mr. Ingram candidly responded to his counsel's question for applying the Cap by saying: "Right now as I'm sitting here, I don't have a great answer." (p. 159) But the Court finds that Mr. Carnahan's calculations contained in Plaintiff's Exhibit 1 provide a practical answer for applying the Cap to CSXT's real property consistent with the application of the Cap to other commercial and industrial real property.

51.     Mr. Ingram suggested that the Cap could be applied "ideally" by getting a valuation of CSXT's real property in each of the 39 counties in which it holds property, and then following the "reassessment implementation" in each of those counties. However, he offered no calculation utilizing this proposal. Furthermore, there is no evidence that such a county-by-county "valuation" is available.

52.     Mr. Ingram's suggestion is unnecessarily complicated. It would require that a "base year" for CSXT be established in each of the 39 counties in which CSXT owns property. CSXT would therefore have numerous "base years," unlike other taxpayers. (Tr. at pp. 200-201) In any event, the testimony is undisputed that CSXT was appraised at full value in 2007, which is the Act's base year. There is no reason to establish different base years. Mr. Carnahan's calculation allows the Cap to be fairly applied to railroads' property without unnecessary intrusion on the state's preferred method for assessing railroad property.

53. Mr. Carnahan testified that for the time period relevant to this case, CSXT did not have any assessable transfers of interest or addition or improvements in South Carolina which would trigger a reassessment under the Act. (Tr. at pp. 41-44)(Tr. at pp. 48-49)  The DOR presented no evidence to contradict Mr. Carnahan's testimony.  (Tr. at p. 79)

54. The Court therefore finds, based on Plaintiff's Exhibit 1, that CSXT's total assessment for tax year 2014, with the benefit of the Cap, would be $33,551,735.

## VI.  ARGUMENT

This is indeed a straightforward case, as recognized by the Fourth Circuit when it said "the application of (b)(4) in this case will be fairly straight-forward."  *See* USCA op. at *9.  One type of taxation the courts have invariably prohibited under Section 306(1)(d) [49 U.S.C. § 11501(b)(4)] is the scheme which "targets" or "singles out" railroads for discriminatory treatment. Examples of such taxes were set forth in the plaintiff's proposed Conclusions of Law at ¶¶ 7 through 14.  And the Fourth Circuit in this case has already endorsed the two appellate cases most directly on point, Burlington Northern RR Co. v. Huddleston and Burlington Northern RR Co. v. Bair.  *See* USCA op. at *3.  As previously briefed, Colorado, like South Carolina, granted a substantial tax benefit to commercial and industrial taxpayers, but not public utilities such as railroads.  The Colorado statute exempted computer software from property taxation, unless the computer software was owned by a public utility (such as a railroad) assessed by the Colorado Department of Revenue.  The Tenth Circuit affirmed the district court's injunction of the assessment of railroad computer software.  Huddleston, 94 F.3d 1413 (10th Cir. 1996).

And in Burlington Northern RR Co. v. Bair, Iowa enacted a legislative scheme to gradually eliminate taxes on commercial and industrial personal property.  This was accomplished by a combination of valuation "rollbacks" and "tax credits" granted against tax liability.  As South Carolina has done, this tax benefit was denied to railroads and other utilities.  The Eighth Circuit

15

held that railroad personal property was entitled to the same benefits of "rollback and credit" that other commercial and industrial property owners enjoyed.  <u>Bair</u>, 766 F.2d 1222 (8th Cir. 1985).

<u>Ogilvie v. State Bd. of Equalization</u> similarly held that a state may not deny a property tax benefit to railroads that it grants to nonutility commercial and industrial taxpayers.  This principle was again applied in a subsequent controversy after the Eighth Circuit affirmed the injunction of taxes on railroad personal property.  <u>Ogilvie</u>, 893 F. Supp. 882 (D. N.D. 1985).  Nonutility commercial and industrial taxpayers enjoyed the advantage of a five percent discount for early payment of real estate taxes but this discount was not offered to railroads.  The district court agreed with the railroad's contention that exclusion of the railroads from the benefits of the discount provision was a discriminatory practice in violation of Section 306(1)(d).  <u>Id.</u> at 886-87.

## VII.  **CONCLUSION**

Stripped of the futile defenses to CSXT's claim by the Fourth Circuit's decision, this case is indeed, "straight-forward."  The unanimous case precedent has held that Section 306(1)(d) prohibits what South Carolina has done here – deny a property tax benefit to railroads that is granted to other commercial and industrial taxpayers.  The alleged "justifications" proffered by the defendants are both legally and factually insufficient to justify the obvious discrimination occurring in this case.  The calculation for the relief due to CSXT for 2014 tax year is undisputed.  As for the appropriate declaratory and permanent injunctive relief, CSXT attaches hereto as Exhibit B its proposed Order previously submitted to the Court.

Counsel for CSXT is happy to attend oral argument if the Court should find it helpful to the resolution of the case.  In addition, CSXT would request the opportunity to file a reply brief should the defendants' supplemental brief raise issues not anticipated by CSXT.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: s/   BRYSON M. GEER
    John C. von Lehe, Jr.
    Federal Bar no. 10407
    E-Mail: john.vonlehe@nelsonmullins.com
    Bryson M. Geer
    Federal Bar no. 7011
    E-Mail: brysongeer@nelsonmullins.com
    Liberty Center, 6th Floor
    151 Meeting Street
    P.O. Box 1806 (29402-1806)
    Charleston, SC (29401-2239)
    (843)843-5200

    James W. McBride (*Admitted Pro Hac Vice*)
    E-mail: jmcbride@bakerdonelson.com
    BAKER, DONELSON, BEARMAN,
     CALDWELL & BERKOWITZ, PC
    901 K Street, NW, Suite 900
    Washington, DC 20001
    (202) 508-3400

    Stephen D. Goodwin (*Admitted Pro Hac Vice*)
    E-mail: sgoodwin@bakerdonelson.com
    BAKER, DONELSON, BEARMAN,
     CALDWELL & BERKOWITZ, PC
    First Tennessee Building
    165 Madison Avenue, Suite 2000
    Memphis, TN 38103
    (901) 526-2000

Attorneys for CSX Transportation, Inc.

Charleston, South Carolina
May 24, 2017