IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| CSX Transportation, Inc., | ) |
| | ) Civil Action No. 3:14-cv-03821-MBS |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| South Carolina Department of Revenue and | ) **OPINION AND ORDER** |
| W. Harley Powell,[1] Agency Director of the | ) |
| South Carolina Department of Revenue, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff CSX Transportation, Inc. (hereinafter "CSXT") is an interstate common carrier by railroad. Tr. 14:3, ECF No. 80. CSXT operates in twenty-three states, including South Carolina. *Id.* at 37:2-14. Defendant South Carolina Department of Revenue is an agency of South Carolina. *See* S.C. Code Ann. § 12-4-10. It is charged by law to administer and enforce the revenue laws of the state. *Id.* Defendant W. Hartley Powell is the Agency Director of the South Carolina Department of Revenue (hereinafter together with Defendant South Carolina Department of Revenue "the State"). This matter is before the court on remand from the United States Court of Appeals for the Fourth Circuit. The issue is whether the South Carolina Reform Act (hereinafter the "SC Valuation Act" or "Act"), which is codified at S.C. Code Ann. §§ 12-37-3110 to -3170, impermissibly discriminates against CSXT in violation of the 4-R Act, 49 U.S.C. § 11501(b).

I.

The Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), codified at 49 U.S.C. § 11501(b)(4), prohibits the imposition of any tax that results in the discriminatory treatment

---

[1] Defendant Rick Reames, III has left the Department of Revenue and W. Hartley Powell has been appointed in his stead. Pursuant to Fed. R. Civ. P. 25(d), "an action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."

of a railroad. The 4-R Act was enacted in part to "restore the financial stability of the railway system of the United States." *CSX Transp., Inc v. Alabama Dep't of Revenue*, 562 U.S. 277, 280 (2011) (*CSX I*). In crafting this legislation, Congress observed that the "railroads 'are easy prey for State and local tax assessors' in that they are 'nonvoting, often nonresident, targets for local taxation,' who cannot easily remove themselves from the locality." *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 336 (1994) (*ACF*) (quoting *Western Air Lines, Inc. v Bd. of Equalization*, 480 U.S. 123, 131 (1987)). "Section 306 of the 4-R Act, now codified at 49 U.S.C. § 11501, addresses this concern by prohibiting the States (and their subdivisions) from enacting certain taxation schemes that discriminate against railroads." *Id.* 336. The 4-R Act provides:

> (b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subsection of a State, or authority acting for a State or subdivision of a State may not do any of them:
>
> (1) Assess rail transportation property at value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
>
> (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
>
> (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
>
> (4) Impose another tax that discriminates against a rail carrier.

49 U.S.C. § 11501(b).

Subsections (b)(1)-(3) prohibit "the imposition of higher assessment ratios or tax rates upon rail transportation property than upon 'other commercial and industrial property.'" *ACF*, 510 U.S. at 337. The term "commercial and industrial property" means property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy. 49 U.S.C. § 11501(a)(4). Subsection (b)(4) has been interpreted

2

broadly and targets all types of discrimination against railroads. See *Alabama Dep't of Revenue v. CSX Transp., Inc.*, 135 S. Ct. 1136, 1141-42 (2015) (*CSX II*). Subsection (b)(4) is "intended as a catchall provision designed to prevent discriminatory taxation of a railroad carrier by any means." *Richmond, Fredericksburg & Potomac R.R. Co. v. Dep't of Taxation,* 762 F.2d 375, 377 (4th Cir. 1985)).

The South Carolina Legislature passed the SC Valuation Act in 2010. The Act generally limits the permissible increases in appraised values of commercial and industrial real properties to no more than 15% within a five-year period for property tax purposes. Tr. 22:6-10; 54:2-5. The SC Valuation Act excludes "[r]eal property valued by the unit valuation method." S.C. Code Ann. § 12-37-3140(D). Railroad companies, along with utility providers such as water, sewer, and power companies, are valued under the unit valuation concept, and thus the real properties of these companies are not afforded the 15% cap. Tr. 145:12-17.

On September 30, 2014, CSXT filed a Verified Complaint seeking an injunction and declaratory relief with respect to real property taxes that were imposed by the State. Compl., ECF No. 1. CSXT alleges that the SC Valuation Act's exclusion of properties valued by the unit valuation method violates Section 306(1)(d) of the 4-R Act. The case proceeded to a bench trial, which was held on November 3, 2015. ECF No. 77. At trial, CSXT relied on subsection (b)(4) of the 4-R Act to argue that the SC Valuation Act imposes another tax "that is directed and targeted at railroads for disfavored treatment." Tr. 54:17-25. In the court's Findings of Fact and Conclusions of Law, ECF No. 86, the court found that the SC Valuation Act does not impose a tax within the meaning of subsection (b)(4). Rather, the court concluded the "Act introduces one particular element, a cap on increases in appraised values, to an already-existing tax scheme." Findings of Fact, 8. Accordingly, the court declined to enter declaratory judgment on CSXT's behalf and dismissed the complaint with prejudice.

On appeal, the Fourth Circuit vacated and remanded this court's ruling. *CSX Transp., Inc. v. South Carolina Dep't of Revenue*, 851 F.3d 320 (4th Cir. 2017). The Fourth Circuit held that

subsection (b)(4) is the proper vehicle for CSXT to bring its challenge against the SC Valuation Act's 15% cap. *Id*. at 326. The Fourth Circuit found that this "court's observation that the [SC Valuation Act] does not itself impose taxes is immaterial . . . and that CSXT's action plainly challenged the imposition of a tax." *Id*. "Thus, if CSXT can prove that the tax imposed was discriminatory, it will have demonstrated a (b)(4) violation." *Id*. Accordingly, the Fourth Circuit instructed this court to determine whether CSXT suffered discrimination from the denial of the SC Valuation Act's 15% cap. *Id.* at 332.

II.

In *CSX I*, the Supreme Court stated that to determine whether a subsection (b)(4) suit may go forward, two questions must be answered: (1) is CSXT challenging "another tax" within the meaning of the statute; and (2) if so, might that tax "discriminate" against railroad carriers by exempting their competitors. *CSX I*, 562 U.S. at 283-84. A State's tax discriminates only where the State cannot sufficiently justify differences in treatment between similarly situated taxpayers. *CSX II*, 135 S. Ct. at 1143. As noted above, the Fourth Circuit has determined that "CSXT's action plainly challenged the imposition of a tax" under subsection (b)(4). *CSX Transp.*, 851 F.3d at 326. The issue before this court on remand is whether the 15% cap constitutes a tax that "discriminates" against CSXT, and, if so, whether the State can demonstrate sufficient justification for the tax.

III.

The determination for property tax in South Carolina is a multi-step process. First, all property that is subject to taxation is valued at its true value, also known as its fair market value. S.C. Code Ann. § 12-37-930. South Carolina has a variety of methods for calculating fair market value. S.C. Code Ann. § 12-4-540. Specifically, for railroads, state statute requires that the Department of Revenue employ the unit valuation concept to calculate the fair market value. *Id*. The unit valuation concept is useful for appraising properties that are spread over multiple taxing and assessing districts. Tr. 142:12-146:16.

4

In calculating the unit values, South Carolina generally relies on an "income approach." *Id*. at 16:12-15; 144:6-13; 152:9-12. The income approach approximates the value of a property based on the income the property is earning. *Id*. The first step in the income approach is for South Carolina to review a company's prior income statements. *Id*. at 38:2-14. From the review of prior income statements, South Carolina can ascertain anticipated future income. *Id*. at 16:16-22. Anticipated future income is then divided by the weighted average cost of capital. *Id*. The resulting amount is the unit value or system value, which is the value of all operating property of the company. In this case, the unit value or system value represents the fair market value of all of CSXT's operating property located across the country. *Id*. at 16:16-25; 17:8-11; 144:14-20.

The next step is to allocate a portion of the calculated unit value to South Carolina. *Id*. at 17:12-20. This allocation is done by balancing a number of factors, including revenue derived in South Carolina versus revenue derived elsewhere; track miles in South Carolina versus track miles elsewhere; and investment in South Carolina versus investment elsewhere. *Id*. Once an allocation percentage has been determined, South Carolina applies it to the fair market value that was previously calculated under the income approach, to arrive at a fair market value solely attributable to property within the state. *Id*. at 17:23-18:2. The next step is to subtract property that has already been taxed or is tax-exempt. *Id*. at 18:6-18. In CSXT's case, there are two subtractions from the fair market value. First, CSXT's licensed motor vehicles are subtracted because they are taxed at the time of registration. *Id*. Second, CSXT's pollution control facilities are subtracted because they are tax-exempt under South Carolina law. *Id*. Once these reductions are made, the resulting value is the appraised value. *Id*. at 18:21-19:3.

After arriving at the appraised value, South Carolina applies a statutory assessment ratio so as to tax property at a percentage of its fair market value. The South Carolina legislature has established and codified statutory assessment ratios applicable to various types of property. *See* S.C. Code. Ann.

5

§ 12-43-220. The statutory assessment ratio for railroad property is 9.5%. *Id.* Indeed, the State applied a 9.5% ratio to the appraised value of CSXT's property. Tr. 19:12-15.

Next, South Carolina applies an equalization factor. *Id.* at 21:5-18; 46:20-22. The equalization factor is a reduction afforded only to transportation companies for hire, such as CSXT, to account for disparities between the fair market valuation of railroads and other properties. *See* S.C. Code. Ann. § 12-43-220(g); Tr. 70:19-20. South Carolina applies an equalization factor of 20% to CSXT's property to arrive at a final property tax assessment. Tr. 19:10-20:4.

The final step is to apportion a percentage of the final property tax assessment to individual counties in South Carolina, based on where a company's property is located. *Id.* at 47:10-18. CSXT has property in thirty-nine of the State's forty-six counties. *Id.* 157:1-2. Each county applies a local tax rate to CSXT's tax assessment, and then each county individually bills CSXT. Tr. 20:13-25; 104:11-15. In CSXT's case, South Carolina followed the preceding steps in calculating the unit value of CSXT's property and applying the equalization factor. The resulting tax assessment for 2014 was $40,727,560. Verified Compl., ECF No. 1 at 3; Plaintiff's Trial Ex. 1. According to CSXT, Defendants' appraisal of CSXT's real operating property in the period between tax years 2007 and 2014 increased approximately 51%, and the appraised value of real property in excess of 15% violates Section 306(1)(d) of the 4-R Act. Verified Compl., 5.

IV.

**A.     15% Cap as a Property Tax Exemption**

As an initial matter, the court addresses the State's alternative argument that the SC Valuation Act creates a partial property tax exemption for real properties subject to the value increase cap. The State asserts that section 12-37-3140(B) caps increases in the fair market value of real property subject to property tax to 15% during a five year assessment cycle. According to the State, "[t]his effectively means that any increase in the value of real property in excess of 15% is not subject to tax." Suppl.

6

Brief , 27, ECF No. 107. The State advances this argument because "a State may grant exemptions from a generally applicable ad valorem property tax without subjecting the taxation of railroad property to challenge under the relevant provision of the 4-R Act, § 306(1)(4), 49 U.S.C. § 11503 (b)(4)." *ACF*, 510 U.S. at 335.

In the court's view, the Fourth Circuit rejected the State's argument on appeal. The Fourth Circuit noted that CSXT "claims that South Carolina's scheme explicitly and unjustifiably singles out railroads – as part of an isolated group – for less favorable *treatment* than other similarly situated taxpayers. If CSXT is correct, then the State's conduct would fit squarely within the Court's definition of discrimination, and there would be no reason why (b)(4) would not apply." *CSX Transp.*, 851 F.3d at 330 (citing *CSX I,* 562 U.S. at 291). The Fourth Circuit concluded,

> In our view, the application of (b)(4) in this case will be fairly straight-forward. Congress designed (b)(4) to prohibit taxes that discriminate against railroads. CSXT alleges that if it is not allowed to benefit from the [15%] cap, its 2014 property tax will be just such a tax. If CSXT is correct, it should prevail. If not, it should lose.

*Id.* at 332.

The 15% cap constitutes a limitation on increases on ad valorem property taxes in South Carolina and not an exemption from tax. The court turns to the question of whether the 15% cap discriminates against CSXT.

**B.      Establishment of Comparison Class**

A subsection (b)(4) case requires " a showing of *discrimination* – of a failure to treat similarly situated persons alike. A comparison class will thus support a discrimination claim only if it consists of individuals similarly situated to the claimant." *CSX II*, 135 S. Ct. at 1141-42.  In *CSX II*, the Supreme Court determined subsection (b)(4), unlike subsections (b)(1)-(3), leaves the comparison class to be determined as it normally is determined with respect to discrimination claims, depending on the theory of discrimination alleged in the claim. *Id.* at 1141. As relevant herein, the Court observed that

7

"[w]hen a railroad alleges that a tax targets it for worse treatment than local businesses, all other commercial and industrial taxpayers are the comparison class." *Id*.

CSXT asserts that the appropriate comparison class is comprised of commercial and industrial real property owners because, like CSXT, "they both own real property that is subject to tax in South Carolina, used for commercial pursuits, and subject to the same property tax rates in each of South Carolina's taxing jurisdictions." Suppl. Mem. in Support of J., 3, ECF No. 106. CSXT points out that the goal of all property assessments in South Carolina is fair market value, regardless of the methodology applied by assessing authorities. CSXT contends that other commercial and industrial properties thus are similarly situated to CSXT, regardless of whether they are assessed on a unit value basis, summation approach, or other method. *Id.* at 4. The State contends, however, that CSXT "must do more than simply articulate a comparison class – a plaintiff must prove that the chosen comparison class is similarly situated to it." Supp. Mem. in Support of J., 16, ECF No. 107. The State asserts that the record is devoid of any evidence from CSXT to support its argument that railroad real property is similarly situated to other real commercial and industrial property. *Id.* In addition, the State asserts that commercial and industrial taxpayers in South Carolina are fundamentally different from CSXT in that (1) the real property of most commercial and industrial taxpayers in located within one county of the state; and (2) the parcels are valued using a summation approach. *Id.* at 17.

CSXT responds that, under *CSX II*, there is no "similarly situated" inquiry because all commercial and industrial taxpayers are in the comparison class. According to CSXT, "[t]he members of the comparison group and [CSXT] are similarly situated in the sense that they all pay county property taxes and their values are instrumental in arriving at the county tax rate to which [CSXT] and the other commercial and industrial taxpayers are all subject." Reply, 3-4, ECF No. 110. Based on the Court's finding in *CSX II* and CSXT's arguments, the court concludes that the appropriate comparison class consists of other commercial and industrial real property taxpayers in South Carolina.

V.

**A.    Burden of Proof**

The Supreme Court has established a two-step inquiry for evaluating a claim of discrimination under § 11501(b)(4). The plaintiff bears the initial burden of establishing a prima facie case of discriminatory tax treatment. *See CSX I*, 562 U.S. at 288, n.8. If the plaintiff does so, the burden then shifts to the defendant taxing authority to offer a "sufficient justification" for the differential tax treatment. *Id.* If the defendant cannot meet its burden, the tax treatment violates § 11501(b)(4). *Id.*

**B.    Prima Facie Case**

CSXT reiterates its position that "what is not seriously contested – namely, denying a significant property tax benefit to railroads that is provided to other commercial and industrial taxpayers, creates a *prima facie* case of discrimination." Supp. Mem. in Support of J., 3. CSXT notes that the "strongest proof of discrimination is the undisputed fact that, over a period of time when the property tax valuation of real or 'other commercial and industrial property could not increase more than 15%, the tax valuation of CSXT's real property increased by approximately 51%." *Id*. at 5. CSXT claims that "the Fourth Circuit's ruling eliminates any plausible argument that CSXT failed to make at least a '*prima facie* case.'" *Id*.

The State candidly "recognizes that in the abstract, the SC Reform Act may have the potential to treat railroad real property differently from commercial and industrial real property with regard to property taxes." Supp. Mem. in Support of J., 23. The State contends, however, that "[b]ecause of legitimate justifications for not extending the 15% value increase cap to railroad real property, any unequal treatment does not constitute prohibited discrimination under § 11501(b)(4)." *Id.* The probable existence of a prima facie case being acquiesced in by the State, the court turns to the issue of justification.

C.  **Justification**

The Supreme Court in *CSX II* held that a comparable tax may justify reasons for a State to deny a tax to railroads. 135 S. Ct. at 1143. In addition, the Court held that courts can consider other alternative tax justifications offered by a State. *Id*.

The State offers several reasons for justifying the difference in tax treatment. The State first asserts that railroads are advantaged by an equalization factor that is applied to reduce the assessed value of railroad property, to include personal, intangible, and real property, before value is certified to the counties. Supp. Mem. in Support of J., 23. At trial, Taylor Ingram, utility assessment coordinator with the South Carolina Department of Revenue, testified that the 20% equalization factor has the effect of "basically remov[ing] or exempt[ing] 20% of that assessment, and you are left with 80% that's now taxable." Tr. 153:24-54:1. Kerry G. Carnahan, employed by CSXT as director of property taxes, explained that the equalization factor "is used to correct some of the inequities that result for different levels of assessment for other commercial/industrial and manufacturing property. So, for instance, I mentioned commercial/industrial property is assessed at six percent and we're assessed at nine-and-a-half percent. Manufacturing property is at ten-and-a-half percent. [The] 20 percent in part corrects that inequity in the different levels of assessment of comparable properties." Tr. 21:11-18. He also testified that the "20% equalization factor is designed to bring South Carolina law, at least in 1991, in conformity with federal law." Tr. 22:1-4.

The equalization factor applies to railroads but does not apply to commercial and industrial taxpayers. Tr. 69:12-14 ("[P]roperties under the unit value are afforded an equalization factor that no other properties are afforded."). The evidence at trial showed that the equalization factor is used to eliminate discrepancies in the fair market value and other commercial and industrial properties. *See* Tr.

70.[2]

CSXT responds that the equalization factor, which originally was calculated in 1991, should not be used to justify the State's refusal to extend the 15% cap to railroads in 2006. Reply, 7. CSXT further contends that the 20% equalization factor is not a "benefit" but a requirement of equal treatment under federal law. *Id.* The court disagrees. The 20% equalization factor is applied to both real and personal railroad property. No other taxpayer is entitled to assessment utilizing the 20% equalization factor. In the court's view, it may take the equalization factor into account in considering whether the State's discriminatory treatment of railroads is justified. As the Supreme Court has stated: "It does not accord with ordinary English usage to say that a tax discriminates against a rail carrier if a rival who is exempt from that tax must pay another comparable tax from which the rail carrier is exempt. If that were true, both competitors could claim to be disfavored—discriminated against—relative to each other." *CSX II*, 135 S. Ct. at 1139 (citing *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 479-82 (1932)).[3]

The State next posits that any inequity in treatment for real property taxes is in part justified by the various tax exemptions enacted by the South Carolina Legislature for the benefit of railroads. Supp. Mem. in Support of J., 25 (citing S.C. Code Ann. § 12-36-2120(9) (sales tax on diesel fuel); S.C. Code Ann. § 12-36-2120(20) (sales tax on railroad cars, locomotives, and parts); and S.C. Code Ann. § 12-

---

[2] For example, under S.C. Code Ann. § 12-43-220, real and personal property owned by or leased to manufacturers and utilities and used in the conduct of the business is taxed on an assessment equal to 10.5% of the fair market value; inventories of business establishments is taxed on an assessed value equal to 6% of the fair market value; agricultural real property used for agricultural purposes is taxed on an assessment equal to 4% of its fair market value; real and personal property owned by or leased to companies primarily engaged in the transportation for hire of persons or property and used in the conduct of such business is taxed on an assessment equal to 9.5% of the fair market value.

[3] CSXT also notes a reduction in property taxes for the manufacturing sector–because this group pays fees in lieu of taxes–"would tend to suggest that the 20% factor is actually too low." ECF No. 110, 7. If so, this is a matter for the legislature, and not the court.

28-2710(9) (user fees for diesel fuel)). The State argues that the combination of tax benefits afforded to railroads potentially offsets any increased property taxes. For the reasons stated regarding the 20% equalization factor, the tax exemptions afforded railroads weigh in favor of justifying the State's exclusion of CSXT from the SC Valuation Act.

Finally, the State observes that the sale of commercial and industrial property triggers an assessment that sets a fair market value on the property without regard to the 15% cap. Thus, "lost" value is recouped in whole or in part for the tax base at the time of sale. Supp. Mem. in Support of J., 26. The State further notes that real properties that undergo improvements go through partial reassessment to add the value of the improvements to the tax rolls at fair market value. *Id.* The State argues that railroad real property "neither changes ownership with any regularity nor are there significant improvements made which would trigger reassessment." *Id.* According to the State, the extension of the 15% cap to railroads would result in the suppression of fair market value that may never be recouped by counties. *Id.*

At trial, the State's witness, Sanford Houck, Jr., explained that properties valued under the unit valuation concept "[n]ever see sales, or very seldom do we see sales." Tr. 69:14-18. In fact, Houck testified that "I can't think of a major railroad that has basically sold in recent history . . . ." Tr. 69:21-23. In regards to improvements, Callahan testified that CSXT has "very few improvements." Tr. 43:18-21. Based on the testimony of Houck, the difference in ownership and improvements matter, because it allows for a reassessment of the property for the following year and to determine whether the 15% cap is triggered. Tr. 65-66.

The court finds the State's arguments, taken as a whole, to be persuasive. The State has shown sufficient justification for not extending the 15% cap to CSXT.

VI.

As the State sufficiently provided justification for any discrimination arising under the 4-R Act,

the court enters judgment in favor of the State.  The preliminary injunction issued November 4, 2018 (ECF No. 6) is lifted, and CSXT's request for permanent injunction is denied.

    **IT IS SO ORDERED**.

/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

January 7, 2019.