IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| CSX Transportation, Inc., | ) | |
| | ) | C/A No. 3:14-3821-MBS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| South Carolina Department of | ) | **ORDER AND OPINION** |
| Revenue and W. Harley Powell, Agency | ) | **AND FINAL JUDGMENT** |
| Director of the South Carolina Department | ) | |
| of Revenue, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On September 30, 2014, Plaintiff CSX Transportation, Inc. ("CSX") filed a complaint against Defendants South Carolina Department of Revenue and Rick Reames III,[1] Agency Director of the South Carolina Department of Revenue (together, the "DOR"), asserting that the South Carolina Real Property Reform Act, S.C. Code Ann. §§ 12-37-3110 to -3170 (the "Valuation Act"), discriminates against CSX in violation of the Railroad Revitalization and Regulatory Reform Act, 49 U.S.C. § 11501(b) (the "4-R Act"). Section 12-37-3140 of the Valuation Act provides:

> (A)(1) For property tax years beginning after 2006, the fair market value of real property is its fair market value applicable for the later of:
>
> (a) the base year, as defined in subsection (C) of this section;
>
> (b) December thirty-first of the year in which an assessable transfer of interest has occurred;
>
> (c) as determined on appeal; or

---

[1]Defendant W. Hartley Powell now is Agency Director. The caption has been revised pursuant to Fed. R. Civ. P. 25(d).

(d) as it may be adjusted as determined in a countywide reassessment program conducted pursuant to Section 12-43-217, but limited to increases in such value as provided in subsection (B) of this section.

(2) To the fair market value of real property as determined at the time provided in item (1) of this subsection, there must be added the fair market value of subsequent improvements and additions to the property.

(B) Any increase in the fair market value of real property attributable to the periodic countywide appraisal and equalization program implemented pursuant to Section 12-43-217 is limited to fifteen percent within a five-year period to the otherwise applicable fair market value. This limit must be calculated on the land and improvements as a whole. However, this limit does not apply to the fair market value of additions or improvements to real property in the year those additions or improvements are first subject to property tax, nor do they apply to the fair market value of real property when an assessable transfer of interest occurred in the year that the transfer value is first subject to tax.

(C) For purposes of determining a "base year" fair market value pursuant to this section, the fair market value of real property is its appraised value applicable for property tax year 2007.

(D) Real property valued by the unit valuation concept is excluded from the limits provided pursuant to subsection (B) of this section.

(E) Value attributable to additions and improvements, and changes in value resulting from assessable transfers of interest occurring in a property tax year are first subject to property tax in the following tax year except as provided pursuant to Section 12-37-670(B).

Simply stated, the Valuation Act limited real property to a 15% increase in taxes between five-year assessment cycles. CSX's real property in South Carolina is valued by the unit valuation concept and thus excluded pursuant to section 12-37-3140(D) from the benefits provided to other real property owners. CSX asserts that, because of the exclusion, its property taxes increased 51% during the period between 2007 and 2014. ECF No. 6-5, 3 (comparing appraised value of CSX's real property for tax year 2007 of $263,636,352 ($352,804,860 X 0.7474) and 2014 of $397,683,191 ($535,888,951 X .7421)); see also ECF No. 142-2.

2

Pursuant to 49 U.S.C. § 11501(b),

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

CSX relies on subsection (b)(4) as the basis for its complaint.[2]

On January 7, 2019, the court issued an order wherein it noted that subsection (b)(4) requires a "'showing of discrimination – of a failure to treat similarly situated persons alike." ECF No. 123, 7 (quoting Alabama Dep't of Revenue v. CSX Transp., Inc., 135 S. Ct. 1136 (2015)). The court observed that, to show discrimination under § 11501(b)(4), the plaintiff must establish a prima facie case of discriminatory tax treatment. Id. at 9 (citing CSX Transp. Inc. v. Alabama Dep't of Revenue, 562 U.S. 277, 288, n.8 (2011)). If the plaintiff does so, the burden then shifts to the defendant taxing authority to offer "sufficient justification" for the differential tax treatment. Id. If the defendant cannot meet its burden, the tax treatment violates § 11501(b)(4). ECF No. 123, 9.

_____

[2] CSX raised identical issues for tax years 2015 (C/A No. 3:15-4625-MBS); 2016 (C/A No. 3:16-3208-MBS); 2017 (C/A No. 3:17-2646-MBS); 2018 (C/A No. 3:18-2609); and 2019 (C/A No. 3:19-2446-MBS). These related actions are stayed pending resolution of the within matter.

The court found that the appropriate comparison class consists of other commercial and industrial real property taxpayers in South Carolina. The DOR conceded that "in the abstract, the [Valuation Act] may have the potential to treat railroad real property differently from commercial and industrial real property with regard to property taxes." Id. Accordingly, the court determined that CSX made out a prima facie case of discrimination. The court also found that the DOR offered sufficient justification for its treatment of CSX under the Valuation Act because (1) railroads are advantaged by a 20% equalization factor that is applied to reduce the assessed value of all railroad property in order to eliminate discrepancies in the fair market value; (2) railroads receive various tax exemptions enacted for their benefit, such as for sales tax on diesel fuel; sales tax on railroad cars, parts, locomotives, and parts; user fees for diesel fuel; and property tax for pollution control facilities; and (3) the extension of the 15% cap to railroads would result in the suppression of fair market value because railroad real property rarely changes ownership, and thus railroads avoid triggering the reassessment of fair market value that comes with sale. Accordingly, the court entered judgment in favor of DOR. Id. at 10-13. CSX appealed.

By opinion issued on May 20, 2020, the Court of Appeals for the Fourth Circuit Court agreed that CSX made out a prima facie showing of discriminatory tax treatment based on the appropriate comparison class of other commercial and industrial real property taxpayers in South Carolina. ECF No. 133, 10. The Fourth Circuit found, however, that DOR had failed to provide sufficient justification for the disparate treatment. The Fourth Circuit stated that the equalization factor is a reduction in the assessed value of property owned or leased by transportation companies for hire, such as CSX, to help negate disparities between fair market valuations of their properties and those of other commercial/industrial and manufacturing properties. The Fourth Circuit noted that the

equalization factor corrects the differences in fair market value assessments of those properties, but had no nexus to the cap set forth in the Valuation Act.  Id. at 12-13.  The Fourth Circuit acknowledged that the equalization factor was put in place to correct other violations of the 4-R Act, but found that the

> equalization factor ensures railroads are similarly situated to other commercial/industrial and manufacturing properties in the calculation of the assessed value.  But the calculation of the assessed value occurs after the calculation of the appraised value.  And the appraised value is where the benefit of the [Valuation Act] would come into play for railroads because it limits the increase in appraisals to 15% over a five year period.  As a result, the equalization factor negates any disparity in the calculation of the assessed value.  The equalization factor does not negate, however, the disparity in the initial calculation of the appraised value.  This disparity carries through to the resulting taxable value of the railroad property.

ECF No. 133, 14.

As to the tax exemptions CSX receives, the Fourth Circuit rejected the notion that the exemptions are roughly equivalent to the benefit railroads would receive from the Valuation Act, or at least found that the DOR did not produce evidence of how a sales tax paid by commercial and industrial taxpayers was roughly equivalent to the property tax paid by rail carriers.  Id. at 15.  The Fourth Circuit also determined that the value of the railroad sales tax exemptions is less than the value of comparable exemptions available to other commercial and industrial taxpayers.  Id. at 16.

Finally, regarding assessable transfers of interest, the Fourth Circuit found that the record contains only speculative evidence of the frequency or value of improvements and sales concerning railroad property.  The Fourth Circuit observed S.C. Code Ann. § 12-37-3135 allows a 25% exemption from property taxes arising from assessable transfers of interest of commercial real property, but this exemption is not available to railroad property, which is assessed at the full fair market value.  ECF No. 133, 18.  The Fourth Circuit rejected the DOR's arguments that the

5

cumulative effect of the proffered justifications provided sufficient justification for the discriminatory tax. Accordingly, the Fourth Circuit reversed and remanded. Id.

This matter now is before the court on motion for entry of declaratory and injunctive relief and entry of final judgment filed by CSX on July 8, 2020. The DOR filed a response in opposition on July 22, 2020, to which CSX filed a reply on August 5, 2020. The court held a hearing on October 2, 2020 via videoconference. At the court's request, the DOR supplemented its response in opposition to CSX's motion on November 3, 2020. CSX filed a reply to the DOR's supplemental response on November 10, 2020.

DISCUSSION

CSX moves pursuant to Rules 54(c) and 58 of the Federal Rules of Civil Procedure for an order granting declaratory and injunctive relief and entry of final judgment that sets forth CSX's 2014 assessed value after applying the 15% cap as mandated by the Fourth Circuit's May 20, 2020 opinion. Relying on the Tax Injunction Act, 28 U.S.C. § 1341; Younger v. Harris, 401 U.S. 37 (1970); and Burford v. Sun Oil Co., 391 U.S. 315 (1943), the DOR contends that the South Carolina Administrative Law Court should determine the application of the 15% cap to CSX's property in South Carolina. The court disagrees and finds it possesses jurisdiction for the reasons set forth in Richmond, Fredericksburg & Potomac R. Co. v. Forst, 4 F.3d 244, 254 (4th Cir. 1993) ("After a careful study of the history of state taxing practices, Congress determined that railroads were entitled to adjudicate their disputes with state taxing authorities in federal court.")

In CSX Transportation, Inc. v. South Carolina Dep't of Revenue, 851 F.3d 320, 322-23 (4th Cir. 2017), the Fourth Circuit described the differences between how ad valorem taxes are determined in South Carolina for commercial and industrial property and railroad property:

6

In the first step, all property subject to taxation in South Carolina is appraised for assessment purposes at its purported "true value," which is "fair market value." S.C. Code § 12–37–930. The methods used for such appraisals vary, however. See, e.g., S.C. Code § 12–4–540(B). South Carolina law specifically provides that railroads are assessed under the "unit valuation" method. See S.C. Code § 12–4–540(B). Under that method, an appraiser values the operating properties of an interstate company as an integrated whole without regard to the value of its component parts. South Carolina generally calculates railroad system values based on the income the property is earning. Once the total value of all of a railroad's real and personal property throughout the United States is determined in this fashion, the next step in the unit valuation process is to allocate the portion of the system value that represents the value of the railroad's property in South Carolina. Finally, property that has already been taxed or that is tax-exempt is subtracted, yielding an "appraised value." Once South Carolina has determined the appraised value of a taxpayer's property in the state, the next step in the tax-calculation process is the application of a statutory assessment ratio. See S.C. Code § 12–43–220. The South Carolina General Assembly has established statutory assessment ratios that apply to various types of property, and for railroad property, the ratio is 9.5%. See S.C. Code § 12–43–220(g). Applying the statutory assessment ratio to the appraised value of a taxpayer's property yields the "assessed value," against which the property tax rate is generally applied and property taxes are levied and collected.

However, in the case of property owned or leased by transportation companies for hire, including railroads, there is an additional step that precedes the application of the property tax rate. To the assessed value of such property, South Carolina applies an "equalization factor," which is a reduction that these companies receive to help negate disparities between the fair market valuation of their properties and those of other commercial/industrial and manufacturing properties. See S.C. Code § 12–43–220(g). Once the appropriate equalization factor is applied, the resulting assessed value is distributed to the various South Carolina counties and cities in which the company operates and these entities in turn apply their local tax rates to determine the taxes the railroad must pay.

The court now must determine how to calculate the maximum assessment on CSX's property for the 2014 tax year. Fed. R. Civ. P. 65 requires that every order granting an injunction must state the reasons why it is issued; state its terms specifically; and describe in reasonable detail–and not by referring to the complaint or other documents–the act or acts restrained or required.

The parties agree that the 2007 tax year commenced the first year of the five-year

7

reassessment cycle. That year, the nationwide unit value was $7,700,000,000. The South Carolina portion of the nationwide unit value was $356,194,300. The DOR applied deductions/adjustments in the amount of $3,389,440, for a taxable value in South Carolina of $352,804,860. The taxable amount was assessed at 9.5% and the 80% equalization rate applied, for a final amount of $26,813,170. Of that amount, 74.75% was allocated to real property, for an allocated tax value of $20,040,163. The personal property assessment of $6,773,007 was added for a total assessment of $26,813.170. ECF No. 142-2, 1.

The DOR submitted the methodology by which it contends the maximum assessment for 2014 should be established. The DOR calculated the unit value of CSX's property based on South Carolina's allocation of 4.479% of the nationwide unit value of $12,000,000,000, which yields $537,516,000. The DOR applied deductions/adjustments in the amount of $1,627,049, which results in a taxable value of CSX personal and real property in South Carolina of $535,888,951. Applying the 9.5% tax rate equals $50,900,450, and then applying the 80% equalization rate yields $40,727,560. The DOR next allocated 74.21% of this sum to CSX's real property, for an allocated value of real property of $30,223,922. The DOR then applied the 15% cap for real property taxes to obtain a capped real property tax in the amount of $26,503,119. The DOR added in the personal property assessment of $10,503,638, for a total assessment of $37,006,750. (ECF No. 142-2.)[3]

CSX argues that the DOR's maximum assessment is incorrect because CSX is not given the benefit of a five-year freeze on real property taxes that other commercial and industrial taxpayers in

---

[3]The DOR submitted a second methodology that applied the assessment in a similar manner; however, the assessments reported by CSX were broken down by county rather than statewide. ECF No. 142-3. The court agrees with CSX that the second methodology is contrary to the Fourth Circuit's ruling that the 15% cap must be applied to the calculation of the statewide appraised value, as described above. Therefore the court will utilize the DOR's first methodology only.

the comparative class receive. Rather, according to CSX, the DOR's method allows multiple yearly increases in CSX's appraised value within each rolling five-year assessment periods until the real property taxes reaches the 15% cap. CSX contends that, under the DOR's method for applying the 15% cap, CSX was assessed at fair market values in 2007, 2010, and 2012 that resulted in a 30% increase in taxes over this period. The DOR argues that section 12-37-3140(B) does not contain any language requiring the fair market value of real property be "frozen" for a period of five years. According to the DOR, section 12-37-3140(B) allows increases in the fair market value up to fifteen percent within the five-year period.

CSX contends that the 15% cap should not be implemented until 2012, the first year of the five year assessment cycle, and its taxes for 2014 should reflect this amount. Thus, for 2012 CSX contends that the capped value of its real property would equal $23,047,018, which sum is CSX's capped total real property tax in 2007 of $20,040,885 times 115%.[4] Adding to this amount CSX's personal property assessment of $10,083,640 yields a 2012 total assessment with a 15% cap of $33,129,729. Using the $23,047,018 capped figure and adding CSX's personal property taxes in 2014 of $10,504,717,[5] CSX contends its total assessment for 2014 should be $33,551,735.

The goal of statutory construction is to harmonize conflicting statutes whenever possible and to prevent an interpretation that would lead to a result that is plainly absurd. Hodges v. Rainey, 533

---

[4]Plaintiff relies on a standard real property valuation of 75% of CSX's unit valuation as set forth in its expert's affidavit. ECF No. 6-5, 3 (Affidavit of Kerry G. Carnahan). Plaintiff's expert attests that the assessed value of CSX's real property in 2007 was $20,040,885, compared to the DOR's assessed value of $20,040,163.

[5]Again, Plaintiff's expert utilized the slightly different personal property assessment of $10,504,717, as compared to the DOR's listing of personal property at $10,503,638. The court will leave it to the parties to determine the correct amounts.

S.E.2d 578, 584 (S.C. 2000) (citing <u>Ray Bell Constr. Co. v. School Dist. of Greenville Cnty.</u>, 401

S.E.2d 725 (1998)).  Section 12-37-3140(B) references S.C. Code Ann. § 12-43-217.  Section 12-43-

217(A) provides that:

> Notwithstanding any other provision of law, once every fifth year each county or the State shall appraise and equalize those properties under its jurisdiction.  Property valuation must be complete at the end of December of the fourth year and the county or State shall notify every taxpayer of any change in value or classification if the change is one thousand dollars or more.  In the fifth year, the county or State shall implement the program and assess all property on the newly appraised values.

A plain reading of section 12-43-217(A) compels the conclusion that a taxing authority may

appraise real property and make its assessment of taxes due only every five years.

> This conclusion is supported by S.C. Code Ann. § 12-43-210, which provides that:

> (A) All property must be assessed uniformly and equitably throughout the State. The South Carolina Department of Revenue may promulgate regulations to ensure equalization which must be adhered to by all assessing officials in the State.

> (B) No reassessment program may be implemented in a county unless all real property in the county, including real property classified as manufacturing property, is reassessed in the same year.

> Further, the DOR's own procedures instruct that

> Real property is reappraised on a countywide basis every five years and is usually subject to reassessment (i.e., assessment based on the reappraised value) in the next year.  S.C. Code § 12-43-217.  For purposes of this reassessment, any increase in the fair market value of any parcel is limited to 15%.  This cap on value remains in effect until an "assessable transfer of interest" or "ATI" occurs.  An ATI will result in a valuation not limited by the 15% cap. . . .

<u>See</u> South Carolina Property Tax (2015 Edition) (https://dor.sc.gov/policy/index/policy-manuals)

(accessed November 20, 2020); <u>see</u> <u>also</u> S.C. Code Ann. § 12-60-2510 (describing procedure for

providing notices to taxpayers of reassessed property values in "reassessment years").

The court concludes that increases in the fair market value of real property may take place

3:14-cv-03821-MBS    Date Filed 11/24/20    Entry Number 159    Page 11 of 11

only every five years and may not exceed 15%. Accordingly, the court grants CSX's motion for declaratory and injunctive relief and entry of final judgment (ECF No. 140). Defendants South Carolina Department of Revenue and W. Hartley Powell, Agency Director of the South Carolina Department of Revenue, his successors, and all those acting in concert or participating with them, are permanently ENJOINED from assessing, levying, or collecting property taxes on railroad operating real property without applying the limitations imposed by the Valuation Act.

For tax year 2014, any assessment of CSX's property in excess of $33,551,735 is ENJOINED, subject to such minor adjustments, as appropriate, in the figures utilized by the parties, as discussed supra at page 9.

For all future tax years, Defendants, their successors, and all those acting in concert or participating with them, shall apply the limitations imposed by the Valuation Act when assessing, levying, or collecting property taxes on railroad operating real property.[6]

The parties shall inform the court within fifteen days of the date of entry of this order the recommended disposition of the related cases listed supra at page 3.

**IT IS SO ORDERED**.


/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

November 23, 2020.

---

[6]The court is aware that CSX pays property taxes directly to the counties in which it functions, and that the counties operate on different five-year cycles. In the court's view, the means by which CSX complies with each county's reassessment cycle is beyond the scope of this case.